UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Pillsbury Company,

Plaintiff,

v.

SMTM Group, L.L.C.,

Defendant.

MEMORANDUM OPINION AND ORDER
Civ. No. 00-2278(MJD/JGL)

---

SMTM Group, L.L.C.,

Counterclaim Plaintiff,

v.

The Pillsbury Company,

Counterclaim Defendant,

And

General Mills, Inc.,

Additional Party in Interest.

---

Timothy M. Kenny, Richard J. Groos and William G. Barber, Fulbright & Jaworski L.L.P. for and on behalf of Plaintiff The Pillsbury Company and the Additional Party in Interest General Mills, Inc.

Martin H. Freeman, Freeman & Freeman, P.C. and James G. Vander Linden, Levander & Vander Linden, P.A. for and on behalf of Defendant SMTM Group L.L.C.

---

Plaintiff The Pillsbury Company ("Pillsbury") brought this declaratory judgment action seeking a declaration from this Court that Pillsbury's use of

FILED FEB 0 9 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

"Toaster Bagel Shoppe" does not constitute infringement, unfair competition, dilution or otherwise violate any right of Defendant SMTM Group, L.L.C. ("SMTM") under the Lanham Act or other statutory or common law.

SMTM thereafter brought a counterclaim against Pillsbury, alleging Pillsbury has violated the Lanham Act, and has engaged in unfair competition, unfair and deceptive trade practices, common law and consumer fraud, wrongful and intentional interference with business relations and false advertising. General Mills has been added as an Additional Party in Interest, as a result of its pending acquisition of Pillsbury.

Before the Court is SMTM's motion for a preliminary injunction, and motions by Pillsbury and General Mills to dismiss.

## FACTS

SMTM is a relatively new company whose entire enterprise centers around the "Toaster Bakeshop" trademark, concept and technology. It claims that its use of the trademark "Toaster Bakeshop" has been in conjunction with its development and marketing of the Toaster Bakeshop technology and concept since 1997. On July 15, 1998, SMTM filed an intent-to-use application for "Toaster Bakeshop" with the United States Patent and Trademark Office ("USPTO"). Kellogg opposed the registration, but agreed to withdraw its opposition if the word "Toaster" was disclaimed. SMTM agreed to file such an amendment, but by Order dated January 10, 2001, the USPTO denied the request to amend. McDade Declaration, Ex. A. Thus, "Toaster Bakeshop" has not yet received registrable status by the USPTO.

From November 3, 1997 through December 12, 1997, Pillsbury paid SMTM $200,000 for the option to evaluate SMTM's Toaster Bakeshop technology. At that time, however, and for twenty years prior, Pillsbury had been involved in research and development of toaster technology, and it currently has on the market three products – Toaster Strudel, introduced in 1984; Toaster Scrambles, introduced in 1997; and Toaster Bagel Shoppe filled bagels, introduced in March 2000. In the Option Contract between Pillsbury and SMTM, the parties acknowledged Pillsbury's previously developed toaster bakery technology:

> SMTM acknowledges that Pillsbury has spent approximately 20 years in developing its own toaster bakery technology, including Toaster Strudel pastry and other breakfast bakery and pastry products. The parties agree that Pillsbury, by entering into this agreement, does not relinquish its right to practice or continue practicing any technology that was in its possession prior to execution of this agreement or which is subsequently independently developed by Pillsbury, subject to any patent rights, which are later obtained by SMTM.

See Mogel Decl., Ex. 5, ¶ 6.

Pillsbury evaluated SMTM's technology, and determined that it was not interested in pursuing its option. SMTM then presented the Toaster Bakeshop concept to several of Pillsbury's competitors, such as VDK Foods (Aunt Jemima/Duncan Hines), Pepperidge Farms, Golden Valley Microwave Foods, ConAgra Frozen Foods and Mrs. Smith's Bakeries. Mogel Supplemental Declaration, ¶ 30.

On June 28, 1998, SMTM entered into a letter agreement with Mrs. Smith's through which SMTM granted Mrs. Smith's the opportunity to negotiate the

exclusive marketing rights to six product lines referred to as "Toaster Bakeshop".[1] SMTM Ex. 29. The letter agreement allowed Mrs. Smith's to test the products, but prevented the sale of such products. Id. SMTM asserts that Mrs. Smith's did, in fact, subject the product line to consumer testing, yet no evidence of such testing, such as methodology or results, has been presented to the Court. In conjunction with the letter agreement, Mrs. Smiths' applied for trademark registration for "Mrs. Smiths' Toaster Bakery." In August 1999, however, Mrs. Smith's informed SMTM that it was experiencing cash flow problems, and asked SMTM if it could suspend the monthly holding fees due under the letter agreement, and whether it could delay commercialization until 2001. SMTM Ex. 35. SMTM determined that it could not accede to Mrs. Smith's request. Mogel Supp. Decl. ¶ 40.

Thereafter, SMTM again asked Pillsbury to evaluate its new, but related, technology for a price of $250,000. Pillsbury offered to use an independent evaluator to look at the technology, so it would not have to look at SMTM's confidential information, yet learn whether SMTM has something worth pursuing. SMTM agreed. The independent evaluator reviewed SMTM's technology and reported that SMTM's technology was underdeveloped, requiring substantial work for commercialization and that its costs estimates were inaccurate. SMTM Ex. 43. Pillsbury informed SMTM that it was not interested in pursuing SMTM's

---

[1] In his Supplemental Declaration, Ron Mogel characterizes this agreement as an exclusive licensing agreement. However, there is no provision in this agreement that grants any licensing rights to Mrs. Smith's regarding SMTM technology or its trademark "Toaster Bakeshop." Rather, the letter agreement only discusses the potential license of the technology, not the mark.

concept and technology. SMTM Ex. 44. Thereafter, SMTM made another proposal to Pillsbury – to have Pillsbury review its "fill" technology for $160,000. SMTM Ex. 45. Pillsbury later declined this proposal as well. SMTM Ex. 46.

In March 2000, Pillsbury began marketing its "Toaster Bagel Shoppe" products, and filed an application with the USPTO to register "Toaster Bagel Shoppe". SMTM alleges that Pillsbury used the information gained during its discussions with SMTM to steal SMTM's "Toaster Bakeshop" name, resulting in Pillsbury's unjust enrichment at SMTM's expense. Specifically, SMTM alleges that Pillsbury's use of "Toaster Bagel Shoppe" has damaged its ability to negotiate with prospective licensees. As an example, SMTM asserts that its negotiations with a primary competitor of Pillsbury told SMTM that Pillsbury's use of "Toaster Bagel Shoppe" has cast considerable question over the value of "Toaster Bakeshop". SMTM Ex. 38. SMTM alleges that Pillsbury's actions have impaired SMTM's ability to offer valuable trademarks, concepts and technology in a competitive market. It further argues that the use of "Toaster Bagel Shoppe" will cause confusion, as is evidenced by the fact that another party SMTM was negotiating with wrongly believed that SMTM was licensing its "Toaster Bakeshop" technology to Pillsbury.

On September 21, 2000, SMTM sent a cease and desist letter to Pillsbury, demanding that Pillsbury cease and desist from further use of "Toaster Bagel Shoppe", or any other trade name using "Toaster" or "Shop", withdraw its application for federal trademark, notify in writing those businesses whose identity

SMTM would provide telling such entities that Pillsbury has stopped using "Toaster Bagel Shoppe" and to contact SMTM to discuss compensation.

Pillsbury has not complied with the cease and desist letter and this litigation thereafter commenced. SMTM seeks an order from this Court, enjoining Pillsbury's use of "Toaster Bagel Shoppe" or otherwise infringing SMTM's "Toaster Bakeshop", ordering Pillsbury to destroy or deliver up all literature, advertisements, video tapes and other materials bearing the infringing mark.

Pillsbury's Motion to Dismiss

Pillsbury has filed a motion to dismiss SMTM's Counterclaim pursuant to Rule 12(b)(6). Pillsbury argues that to possess rights in a trademark, the purported owner must have actually adopted and commercially used the mark. It is Pillsbury's position that SMTM has not, and cannot allege use rising to this level, therefore dismissal is appropriate.

In its Counterclaim, SMTM does allege that it has continuously used the mark in commerce since 1997. Counterclaim ¶ 10. SMTM has also submitted numerous documents in its efforts to establish sufficient use. Because SMTM has properly alleged a trademark infringement claim in its Counterclaim, and has submitted evidence in an effort to prove sufficient use, Pillsbury's motion to dismiss for failure to state a claim must be denied. The Court will thus proceed to address SMTM's motion for a preliminary injunction.

SMTM's Motion for Preliminary Injunctive Relief

The Eighth Circuit has established that the following factors are to be used when considering a motion for injunctive relief:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

Dataphase Sys., Inc. v. C. L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); accord Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1090 (D. Minn. 1981), aff'd, 684 F.2d 565 (8th Cir. 1982). The standards under Minnesota law are substantially the same, with the added factor of preserving the status quo. Dahlberg Bros., Inc. v. Ford Motor Co., 272 Minn. 264, 275, 137 N.W.2d 314, 321-322 (1965).

Analysis

1. Irreparable Harm

The Eighth Circuit has held that as a trademark represents intangible assets such as goodwill and reputation, irreparable injury may be presumed if SMTM can successfully establish probable success in proving a likelihood of confusion. General Mills v. Kellogg Company, 824 F.2d 622, 625 (8th Cir. 1987).

2. Success on the Merits

SMTM has asserted claims of trademark infringement pursuant to the Lanham Act, 15 U.S.C. § 1125(a) and pursuant to Minnesota common law and statutory law. To show a probability of success on the merits of its trademark infringement claims, SMTM must show: 1) that it has a protectible trademark; 2) it has priority of use of the claimed mark; and 3) Pillsbury's use of the mark creates a likelihood of confusion among an appreciable number of relevant consumers as to the source or association between the two marks. Duluth News-

Tribune v. Mesabi Publishing Company, 84 F.3d 1093, 1095 (8th Cir. 1996); Transclean Corp v. Bridgewood Services, Inc. 77 F.Supp. 2d 1045, 1092 (D. Minn. 1999)(noting that the standards employed under the Lanham Act and the Minnesota Deceptive Trade Practices Act are substantially the same).

A. Ownership of Trademark

Before SMTM is entitled to the injunctive relief sought, it must demonstrate to the Court that it can likely prove it has ownership rights in the trademark "Toaster Bakeshop." SMTM has yet to achieve registration of the mark by the USPTO, and is thus not entitled to the protections afforded a registered mark.

SMTM has filed an "intent-to-use" application with the USPTO. Absent use of the mark, however, a pending ITU application provides no protections. Fila Sport S.p.A. v. Diadora Am., Inc., 141 F.R.D. 74, 77-80 (N.D. Ill. 1991)(dismissing ITU applicant's infringement claim for lack of subject matter jurisdiction, because ITU section of the Lanham Act does not confer federal jurisdiction independent of that existing for applications based on actual use or actual registration). An intent-to-use applicant may claim the benefits of use of the mark in commerce by filing an amendment to the application. 15 U.S.C. § 1051(c). SMTM has filed no such amendment with the USPTO to date.

Because SMTM has not obtained registration of the mark, to show that it has common law trademark rights to "Toaster Bakeshop", SMTM must show that it adopted and used the mark in commerce. Transclean, 77 F. Supp. 2d at 1092 (citing United States v. Steffens, 100 U.S. 82 (1879)). It is not enough that the mark is used in advertising or other documents apart from the goods. Electronic

Communications, Inc. v. Electronic Components for Industry, 443 F.2d 487, 492 (8th Cir. 1971). Use of the mark on goods, sufficient to invest ownership rights, occurs when the mark is "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and . . . the goods are sold or transported in commerce." 15 U.S.C.§ 1127.

Pillsbury argues that SMTM cannot establish sufficient use, as it has not placed any goods, by itself or through a licensee, with the mark affixed in the market. The only use of the mark has been in connection with promotion and marketing of its "technology" to food producers, not to consumers. Pillsbury argues that while SMTM desires to protect its intention to create goodwill, it has failed to put forth any evidence that any goodwill has thus been created.

SMTM responds that it has "used" the trademark in a manner sufficient to warrant protection since 1997. SMTM argues that it need not have sold the product to the end user in order to have a remedy. It is sufficient that the trademark was used with the goods in commerce. SMTM argues that it has used the mark on displays associated with the product, and that such products have been transported in commerce. Based on the particular facts of this case, SMTM asserts that the relevant public or market is the food manufacturer, not the consumer.

SMTM is in the business of selling a concept and technology for toaster bakery products, it is not in the business of manufacturing or selling finished

products to retailers. Thus, no evidence has been presented to the Court in the form of labels, boxes or other containers, upon which "Toaster Bakeshop" is affixed. SMTM asserts that it has used the mark in displays when it presented its concepts and technology to a number of food manufacturers. However, SMTM did not provide to the Court any evidence as to what these presentations consisted of. SMTM has not presented the Court copies of displays or other materials to which the mark "Toaster Bakeshop" is affixed, or any evidence supporting its assertions that such displays were transported in commerce.

In his declaration, Ron Mogel states "SMTM's use of the trademark "Toaster Bakeshop" in commerce has been in conjunction with its development and marketing, to potential licensees, of the "Toaster Bakeshop" concept and technology continuously over a period beginning in early 1997." Mogel Decl. ¶ 5. In support of this assertion, the Mogel Declaration cites to Exhibit 4. Nothing in Exhibit 4, however, evidences that the mark was affixed to a good or to a display of the good. SMTM has the burden of producing evidence to supports its assertion that the mark was used in commerce. See, Transclean, 77 F. Supp. 2d at 1094 (defendant granted summary judgment, as plaintiff failed to submit evidence, other than self-serving affidavits, that mark was used in connection with product).

Even if such evidence was presented, however, the Court finds that SMTM such use would not be sufficient to warrant protection of the trademark laws. To determine use, the Court must keep in mind the basis principles underlying the trademark protection laws.

> [R]ight[s] to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918). Following this principle, the Third Circuit determined that mere advertising and promotional activities, absent the provision of the advertised services, does not constitute use for purposes of determining ownership in a trademark. Buti v. Perosa, S.R.L., 139 F.3d 98, 103-104 (3rd Cir. 1998). See also, Lucent Information Management, Inc. v. Lucent Technologies, Inc., 186 F.3d 311 (3rd Cir. 1999)(single sale and small number of sales presentations not sufficient to establish prior use); Duffy v. Scharles Schwab & Co., 97 F. Supp. 2d 592 (D.N.J. 2000)(plaintiff's distribution of samples to a few companies not sufficient to establish prior use); Future Domain Corp. v. Trantor Systems, 27 U.S.P.Q.2d 1289 (N.D.Cal. 1993)(evidence that plaintiff was first to choose mark, distribution of 200 free samples at trade show, display of mark at trade show attended by approximately 150,000 person and distribution of thousands of fliers and brochures not sufficient to establish prior use); Simmons v. Western Publishing Company, Inc., 834 F. Supp. 393 (N.D. Ga. 1993)(evidence that plaintiff sent information regarding a game entitled "Pen the Pig", including photographs and instructions, to forty or fifty game companies, and evidence that the game was shipped to a potential manufacturer insufficient to establish public use necessary to establish ownership of mark).

SMTM relies on four cases in support of its position that it demonstrated sufficient use warranting trademark protection. None of the cases cited are

binding on this Court, however, and they do not stand for the proposition for which it is cited.[2]

For example, SMTM places much emphasis on New England v. Duplicating Co., Inc. v. Mendes, 190 F.2d 415 (1st Cir. 1951) for the proposition that to show use sufficient to invest trademark ownership, one must first show adoption of the mark and "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark" and that sales are not necessary to show use. Id. at 418. In that case, however, the court found sufficient evidence of use, as the plaintiff had adopted the mark, and had sold two machines with the marked affixed. Id.

The Eighth Circuit has not adopted the "use" test articulated by the First Circuit in Mendes. In fact, existing Eighth Circuit case law runs somewhat contrary to the First Circuit test. For example, in Flavor Corporation of America v. Kemin Industries, Inc., 493 F.2d 275 (8th Cir. 1974), the court rejected the argument that sporadic mailings of price lists and advertising circulars to potential customers, notwithstanding the absence of sales, is evidence of secondary meaning, because such argument was "contrary to the common law concept that trademark rights are acquired only by actual use of a mark in commerce in connection with the goods."

The next case cited by SMTM is Blue Bell, Inc. v. Farah Manufacturing Company, Inc., 508 F.2d 1260, 1265 (5th Cir. 1975). In Blue Bell, the court noted

[2] In fact, one of the cases cited has been vacated. WarnerVision Entertainment, Inc. v. Empire of Carolina, Inc., 915 F. Supp. 639 (S.D.N.Y. 1996) vacated on other grounds, 101 F.3d 259 (2nd Cir. 1996).

that the "primary, perhaps singular purpose of a trademark is to provide a means for the consumer to separate or distinguish one manufacturer's goods from those of another." Id. at 1265. It also recognized that "[a]n axiom of trademark law has been that the right to register a mark is conditioned upon its actual use in trade." Id. at 1266. The court went on to hold that intra-corporation sales are not evidence of sufficient use, nor is affixing a secondary label to a preexisting product, as the use must be bona fide.

Finally, SMTM cites to General Business Services, Inc. v. Rouse, 495 F. Supp. 526 (E.D. PA. 1980) for the proposition that the owner of the mark need not be the manufacturer of the good to be entitled to trademark protection. Specifically, the opinion states:

> The use of a trademark, however, does not impart that the articles on which it is used are manufactured by the user. It is enough that they are manufactured for him, that he controls their production or that they pass through his hands in the course of trade and that he gives to them the benefit of his reputation or of his name and business style.

Id. at 539. SMTM then argues that the "Toaster Bakeshop" products passed through the hands of SMTM's principals in the course of trade, and that SMTM gave those products the benefit of its reputation, name and business style, therefore it has established sufficient use of the mark. There is no evidence before the Court, however, that "Toaster Bakeshop" products are manufactured for SMTM by another, and that SMTM then sells the product, with its mark affixed, to an end user. Accordingly, Rouse has no application to this case.

In another attempt to show ownership through use, SMTM asserts that while Mrs. Smith's was under agreement to evaluate SMTM's technology and

concept, Mrs. Smith's engaged in consumer testing. As evidence of this consumer testing, SMTM cites to its Exhibit 30. Exhibit 30 consists of print layouts produced by Mrs. Smith's, allegedly in conjunction with consumer testing. However, there is no evidence that these layouts were presented to consumers, and more significantly, the layouts include Mrs. Smith's logo, not SMTM's. Thus, even if the layouts were shown to consumers, they would determine the source to be Mrs. Smith's, not SMTM.

Based on the record currently before it, the Court finds that SMTM has not met its burden of establishing a likelihood of success in proving it has ownership rights in the mark at issue based on prior use in commerce.

B. Likelihood of Confusion

Assuming arguendo SMTM can establish sufficient use, SMTM must still show Pillsbury's use of the mark "Toaster Bagel Shoppe" creates a likelihood of confusion. The factors that the Court are to consider regarding likelihood of confusion are: 1) the strength of the trademark; 2) the similarity between the parties' marks; 3) the competitive proximity of the parties' products; 4) the alleged infringer's intent to confuse; 5) evidence of actual confusion; and 6) the degree of care reasonably expected of the plaintiff's potential customers. Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 774 (8th Cir. 1994). No one factor is controlling. Duluth News-Tribune, 84 F.3d at 1096.

SMTM characterizes its case as one of reverse confusion – where the "customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user – that is, reverse confusion occurs

when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user. . . " Dream Team Collectibles, Inc. v. NBA Properties, Inc., 958 F. Supp. 1401, 1408 (E.D. Mo., Eastern Div. 1997)(citing J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 23:10, p. 23-22 (4th ed. 1996)). Such reverse confusion may cause the consumers to believe that the senior user is the unauthorized infringer, injuring the senior user's reputation and impair its goodwill. Id.

In cases of reverse confusion, the burden of proof remains the same. SMTM must show likelihood of confusion, but to do so, the factors to determine likelihood of confusion must be modified in a case of reverse confusion. Id.

i) Strength of the Mark

To make this determination, the Court should consider whether the mark is arbitrary or fanciful, suggestive, descriptive or generic. Cellular Sales, Inc. v. MacKay, 942 F.2d 483 (8th Cir. 1991). Categorization of a mark is a factual determination involving the examination of two factors - the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consuming market. Woodroast Systems v. Restaurants Unlimited, 793 F.Supp. 906, 911 (D.Minn. 1992) aff'd 994 F.2d 844 (8th Cir. 1993)(citations omitted). "The distinctiveness of a mark is measured by its tendency to identify a product sold under a mark as emanating from a single, although possibly anonymous source." Id.

The strongest types of marks are those classified as arbitrary or fanciful marks. Such marks are 'a word, either unknown or completely out of common usage, coined for the sole purpose of identifying products in the market place.'" Woodroast, 793 F.Supp. at 911 (citing, Aveda Corp. v. Evita Marketing, Inc., 706 F.Supp. 1419, 1428 (D.Minn. 1989))(further citations omitted). The weakest marks are generic. Generic terms are not entitled to trademark protection "because such words are in 'the public domain and available for all to use'. . . and because such terms 'describe not only a particular product or service but also a type or kind of product or service.'" Cellular Sales, 942 F.2d at 486 (citations omitted). In the middle of the spectrum are suggestive and descriptive marks. A suggestive mark "subtly connotes something about the product" and requires imagination, thought and perception to reach a conclusion as to the nature of the product while a descriptive term immediately conveys the ingredients, qualities and characteristics of the product. Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934 (10th Cir. 1983). A descriptive mark can only be protected if it has become distinctive by acquiring secondary meaning. Woodroast, at 912. The distinction between a generic mark and a descriptive mark is one of degree. American Television v. American Communications, 810 F.2d 1546, 1548-49 (11th Cir. 1987).

SMTM argues that its mark is arbitrary – "Toaster Bakeshop" does not describe the product, rather it conveys a fanciful impression that relates the food to a pleasant environment. The Court disagrees and finds that the mark is descriptive – it tells the reader that the product is a type of food found in a bakeshop that is cooked in a toaster. Furthermore, there appears to be

widespread use of the terms "toaster" and "bakeshop" as is evidenced by the many registrations of such marks, which include either "toaster" or "bakeshop", and the prevalence of disclaimers to such terms. Zeimes Decl. Exs. C-M. Evidence of third party usage on similar marks on similar goods can be used to show that the mark is weak and entitled to narrow protection. General Mills, 824 F.2d at 626-627.

As additional evidence of the mark's weakness, the Court notes that even though SMTM filed its application to register its mark prior to Pillsbury application, the USPTO nonetheless determined that Pillsbury's registration would not be denied on the basis that similar registered or pending mark which would bar registration. Meger Decl. Ex. H. Evidence has also been submitted to the Court to show that registration of "Toaster Bakeshop" is unlikely. Kellogg has filed an opposition to SMTM registration application, asserting that "Toaster" cannot be registered, as it is descriptive. In response to this opposition, SMTM moved to amend its application to disclaim "Toaster". The amendment was denied because SMTM had previously disclaimed "Bakeshop". McDade Declaration. Ex. A. The USPTO determined that SMTM had not demonstrated withdrawal of the previously entered disclaimer to "Bakeshop" was appropriate, "[t]hus, amendment of the mark to disclaim "Toaster" results in a disclaimer of the entire mark. A mark which must be entirely disclaimed has no unregistrable component, but is instead entirely nonregistrable." Id.

Because the mark is descriptive, SMTM would only be entitled to protection if the mark has acquired secondary meaning. Yet, no evidence has

been submitted to support a finding of secondary meaning. Accordingly, the Court finds that the mark is entitled to little protection.

2) Similarities Between the Marks

The next factor to consider is the similarities between the marks. SMTM argues that the marks are similar – they sound similar and consist of three parts, both containing "toaster" and "shop" and a middle element denoting a baked good. Pillsbury argues that the marks are not similar because they have different pronunciation, appearance and meaning. Pillsbury asserts that its mark is dominated by "bagel", which is not interchangeable with "bake".

"The use of identical, even dominant, words in common does not automatically mean that two marks are similar." General Mills, at 627. In analyzing the similarities between two marks, the Court should look to the overall impression created by the marks, such as the color schemes, lettering styles, box designs and use of "house marks". Id. In this case, a Pillsbury product is clearly identified as such, with the use of its famous trademarks and trade dress, such as the Pillsbury brand, the Barrelhead Logo and the use of the Pillsbury doughboy. Goldstein Declaration, Ex. A. The Court finds that this factor also weighs against a finding of likelihood of confusion.

3) Competitive Proximity of Competing Products.

Another factor is the competitive proximity of the competing products. At this point, SMTM has not produced a product, only a technology that it is attempting to sell to food manufacturers. Pillsbury, on the other hand, produces a

frozen, filled bagel that is sold to retailers for sale to consumers. Accordingly, this factor also weighs against a finding of likelihood of confusion.

4) Intent

This factor requires a showing of the junior user's intent to "pass off" its goods as those of the senior user. However, in reverse confusion cases, the junior user, by definition, does not intend to pass off its product as that of the senior user. Thus, the intent factor in such cases should focus on whether the junior user 1) conducted an adequate name search for other companies marketing similar goods under the mark in question; 2) followed through with their investigation when they found there were such companies; 3) considered the likelihood of confusion with other companies' products; 4) attempted to contact companies using a similar mark; and 5) were careless in their evaluation of the likelihood of confusion. Dream Team, 958 F. Supp. at 1408 (citing Fisons Horticulture, Inc. v. Vigoro Indus. Inc., 30 F.3d 466 (3rd Cir. 1994)). In this case, SMTM argues that as Pillsbury had actual knowledge of SMTM's mark and its related concept and technology, this factor weighs in its favor. While there is evidence to support a finding that Pillsbury was aware of the mark before it began to use "Toaster Bagel Shoppe", the evidence does not necessarily support a finding that Pillsbury was careless in adopting the mark, based on the lack of evidence of prior use by SMTM, and the weakness of SMTM's mark. Thus, at this point, this factor does not favor injunctive relief.

5) Actual Confusion

The Court must also determine if there is evidence of actual confusion. The only evidence presented by SMTM as to confusion is the declaration of Ron Mogel, in which he described a conversation he had with an unidentified competitor that mistakenly believed that Pillsbury had licensed SMTM's technology. This evidence misses the mark, however. Evidence of customer confusion relevant to trademark infringement is evidence that a customer mistakenly purchased Pillsbury's product, because it was confusingly similar to SMTM's product. No such evidence has been presented to the Court as to this type of confusion. Thus this factor weighs against a finding of likelihood of confusion.

6) Degree of Care of Relevant Consumer

Finally, to determine likelihood of confusion, the Court must look at the degree of care taken by SMTM's customers. In this case, SMTM's customers are food manufacturers. Pillsbury argues, and the Court agrees, that such customers are sophisticated, knowledgeable and careful about their business dealings. As a result, it is unlikely that they would be confused by Pillsbury's use of "Toaster Bagel Shoppe" to the detriment of SMTM.

Taking all of these factors together, the Court finds that SMTM has not met its burden of showing a likelihood of confusion among the relevant consumers. Accordingly, SMTM has not met its burden of showing a likelihood of success on the merits of its trademark infringement claims.

3. Balance of Harms

SMTM argues that if the injunction is issued, Pillsbury would only be inconvenienced by lost sales of the allegedly infringing product, which would consist of only a tiny fraction of Pillsbury's operations.

Pillsbury responds that the harm it would suffer if the injunction were issued would be great. It would have to remove all existing product, and destroy it, because the cost of repackaging would be prohibitive. Pillsbury further argues it would incur significant expenses in developing a new name, sales material, advertising and transportation costs – which could total $40,000,000. As SMTM has not shown that it will succeed on the merits of its trademark claims, this factor weighs against injunctive relief.

4. Public Interest

Public policy favors prevention of consumer confusion, protecting intellectual property and open and fair competition. Again, as SMTM cannot show success on the merits, this factor weighs against injunctive relief.

General Mills Motion to Dismiss

General Mills, Inc. was added as an additional party in interest because of its pending purchase of Pillsbury. General Mills moves to dismiss, as the purchase has not been completed, and that General Mills has never had any ownership interest in or involvement is the business activities of Pillsbury.

SMTM does not oppose the motion to dismiss, but responds that it was merely putting General Mills on notice that this Court may take action that may affect its interests. SMTM asserts that if General Mills wishes to withdraw, it does

so at its own risk, and cannot later complain that it was not afforded the opportunity to protect its interests.

IT IS HEREBY ORDERED THAT:

1. SMTM's Motion for a Preliminary Injunction is DENIED.
2. Pillsbury's Motion to Dismiss is DENIED.
3. General Mills' Motion to Dismiss is GRANTED.
4. Pillsbury's Motion to Strike is denied as MOOT.

Date: Feb. 9, 2001

Michael J. Davis
United States District Court